IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH BRUNO-MARTINEZ,

Petitioner,

vs.

G. LEWIS, Warden, Pelican State Prison,

Respondent.

No. 2:11-cv-02653-JKS

MEMORANDUM DECISION

Joseph Bruno-Martinez, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Bruno-Martinez is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Pelican Bay State Prison.  Respondent has answered, and Bruno-Martinez has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

Bruno-Martinez was convicted by a jury of attempted murder (Cal. Penal Code §§ 664/187), shooting at an occupied vehicle (Cal. Penal Code § 246), and having committed both offenses for the benefit of a street gang (Cal. Penal Code § 186.22(b)(1)).  He was also convicted of using a firearm in connection with the attempted murder (Cal. Penal Code § 12022.53(c)).  In November 2008 the Sacramento County Superior Court sentenced Bruno-Martinez to a determinate term of twenty-seven years on the attempted murder count and a concurrent indeterminate term of fifteen years to life on the shooting at an occupied vehicle count.  Sentencing on all other counts was stayed under Cal. Penal Code § 654.  The California Court of Appeal, Third Appellate District, affirmed Bruno-Martinez's conviction and sentence in

an unpublished decision,[1] and the California Supreme Court denied review on July 14, 2010.

Bruno-Martinez timely filed his Petition for relief in this Court on October 7, 2011.

The facts underlying Bruno-Martinez's conviction, as recited by the California Court of

Appeal:

FACTS AND PROCEEDINGS

On the evening of August 4, 2007, Roland R., Edgar E., Marco C., and Carmen M. attended a birthday party at a restaurant in Rancho Cordova. They arrived around 10:00 p.m. in Carmen's vehicle. At approximately 1:30 a.m., they began to depart. However, as Roland stepped outside the front door, he was approached from behind by [Bruno-Martinez]. [Bruno-Martinez] said something about the tattoo on Roland's arm, which read "M.O.B.," and asked Roland where he was from. [Bruno-Martinez] was wearing a red shirt and red khaki shorts, and there were six or seven others with him.

Roland interpreted [Bruno-Martinez's] question as a reference to gang affiliation and responded that he was not a gang member. However, [Bruno-Martinez] did not accept this denial and "started cussing at Roland" and said something about "Fruitridge." Roland said he did not want any trouble and began moving toward Carmen's vehicle. Meanwhile, [Bruno-Martinez] pulled a handgun out from under his shirt.

Roland and the others reached Carmen's vehicle and got inside. However, they could not get it started. At the same time, [Bruno-Martinez] shot once into the air and then began shooting at the vehicle. Roland and the others climbed out and ran.

In all, at least seven shots were fired, five from a .40 caliber gun and two from a .45 caliber gun. Carmen's vehicle was hit multiple times and one of the windows was shattered. None of Roland's group was hit by the shots.

Roland and the others were later shown a photographic lineup and they all selected [Bruno-Martinez]. They were also shown a photograph of [Bruno-Martinez] taken earlier that evening inside the restaurant and identified him as the shooter.

[Bruno-Martinez] was charged with attempted murder of Roland R., with enhancements for personal use of a firearm and commission of the offense for the benefit of a criminal street gang. He was also charged with discharging a firearm at an occupied vehicle, also with a gang enhancement.

At trial, none of the four in Roland's group was able to identify [Bruno-Martinez] in the courtroom as the shooter. Carmen testified she did not remember much about what happened and could not recall who was doing the shooting.

---

[1] *People v. Bruno-Martinez*, No. C060660, 2010 WL 1217966 (Cal. Ct. App. Mar. 30, 2010).

Detective Jason Ramos, a gang expert, testified that [Bruno-Martinez] is a validated member of the Nortenos criminal street gang and that this was "absolutely" a gang shooting.  Ramos relied on the following factors: [Bruno-Martinez] was wearing red at the time, he was in the company of another who was wearing red and sporting a Mongolian haircut, [Bruno-Martinez] said something about "Fruitridge" at the time of the incident, gang members typically verbalize the area they are from before committing crimes, [Bruno-Martinez] confronted an individual about a tattoo on his arm and asked where he was from, and such question is a common precipitator of gang violence.

[Bruno-Martinez] was found guilty on both charges and all enhancements were found true.  He was sentenced on the attempted murder charge to a determinate middle term of seven years, plus 20 years for the weapon enhancement.  On the charge of shooting at an occupied vehicle, [Bruno-Martinez] received a consecutive, indeterminate term of 15 years to life by virtue of the gang enhancement (see § 186.22, subd. (b)(4)(B)).[2]

## II.  GROUNDS RAISED/DEFENSES

Bruno-Martinez raises three grounds:  (1) the trial court erred in giving a "kill zone" instruction; (2) the trial court erred by failing to question the entire jury on a jury tampering question; and (3) that there was insufficient evidence to establish the gang-related enhancement.  Respondent contends that the second ground is procedurally barred and the third ground unexhausted.  Respondent raises no other affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[2] *Id.* at 1-2.

proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

---

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412 (alteration added).

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[12]

---

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[13]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[14]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[15]

## IV.  DISCUSSION

Ground 1:  "Kill-Zone" Instruction

As described by the California Court of Appeal, the following occurred before the trial court.

> During a discussion of jury instructions outside the presence of the jury, the court indicated it would be giving CALCRIM No. 600 on the elements of attempted murder without an optional paragraph relating to a kill zone theory.  The parties acquiesced, with the prosecutor indicating he was not pursuing such a theory and defense counsel indicating he had not proceeded against such a theory.  The jury was instructed as follows:
> "The defendant is charged in Count 1 with attempted murder.  To prove that the defendant is guilty of attempted murder, the People must prove that:
> "1. The defendant took direct but ineffective steps toward killing another person; and

---

[13] *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

"2. The defendant intended to kill that person.

"A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the end plan."

During deliberations, the jury sent out the following question: "On Count 1 do we have discretion to find guilty of attempted murder charges without specifying Roland [R.]?" After discussion with counsel, the court gave the following response: "No. The victim alleged in the charge is 'Roland [R.]' However, you may consider the following instruction of law as a supplement to Instruction 600." The court then read the following modified version of the optional kill zone paragraph in CALCRIM No. 600:

"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Roland [R.], the People must prove that the defendant not only intended to kill anyone in Carmen [M.]'s car but also either intended to kill Roland [R.], or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Roland [R.] by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Roland [R].[16]

Bruno-Martinez presents the same argument to this Court as he did before the California

Court of Appeal, to wit:

[Bruno-Martinez] contends the foregoing instruction was inappropriate under the facts of this case, because he was charged with a single count of attempted murder of a specific victim. [Bruno-Martinez] further argues the instruction as given was seriously flawed, by suggesting that he could be found guilty of attempted murder of Roland R. if he intended to kill *anyone* in the car, thereby authorizing the jury to apply a transferred intent theory. In effect, [Bruno-Martinez] argues, the instruction eliminated the specific intent requirement of attempted murder. [Bruno-Martinez] further argues the instruction was flawed in that it used the word "harming" in the final sentence rather than "killing." [Bruno-Martinez] argues these

---

[16] *Bruno-Martinez*, 2010 WL 1217966 at *2.

flaws increased the likelihood the jury convicted him without finding he intended to kill Roland R.[17]

The California Court of Appeal rejected Bruno-Martinez's arguments, stating:

> In *People v. Bland* (2002) 28 Cal.4th 313, 121 Cal. Rptr. 2d 546, 48 P.3d 1107, the California Supreme Court rejected use of a transferred intent theory in a prosecution for attempted murder. The court explained that while intent to kill a specific victim may transfer to other victims who are in fact killed, "this rationale does not apply to persons not killed." (*Id.* at p. 327, 121 Cal. Rptr. 2d 546, 48 P.3d 1107.) According to the court, "[t]he crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences." (*Ibid.*) The court explained: "The world contains many people a murderous assailant does not intend to kill. Obviously, intent to kill one person cannot transfer to the entire world. But how can a jury rationally decide which of many persons the defendant did not intend to kill were attempted murder victims on a transferred intent theory?" (*Id.* at p. 329, 121 Cal. Rptr. 2d 546, 48 P.3d 1107.)
>
> Nevertheless, the court recognized that while transferred intent is not appropriate for attempted murder, a defendant who shoots into a group of people within a "kill zone" may be held liable for attempting to kill all of them on a concurrent intent theory. (*People v. Bland, supra,* 28 Cal.4th at p. 329, 121 Cal. Rptr. 2d 546, 48 P.3d 1107.) "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." (*Ibid.*)
>
> California courts have applied this concurrent intent and kill zone theory where the defendant fired a weapon into a vehicle carrying multiple passengers (see *People v. Campos* (2007) 156 Cal. App. 4th 1228, 1233, 1244, 67 Cal. Rptr. 3d 904), where the defendant set arson fires at both entrances to a victim's home without knowing others were present (see *People v. Adams* (2008) 169 Cal. App. 4th 1009, 1013-1014, 1020-1023, 86 Cal. Rptr. 3d 915), and where the defendant fired multiple shots at a group of people standing in front of a market (see *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1391, 1393-1397, 75 Cal. Rptr. 3d 200).
>
> In *People v. Stone* (2009) 46 Cal.4th 131, 92 Cal. Rptr.3d 362, 205 P.3d 272 (*Stone*), the defendant was charged with and convicted of a single count of attempted murder of a specific victim after he fired a single shot at a group of 10 people, including the named victim. (*Id.* at p. 135, 92 Cal. Rptr. 3d 362, 205 P.3d 272.) The trial court gave the following kill zone instruction: "'A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or . . . "kill zone". . . . [¶] In order to convict the defendant of the attempted murder of [Joel F.], the People must prove either that the defendant

---

[17] *Id.*

intended to kill [Joel F.], or that he not only intended to kill another human being, but also that he intended to kill anyone within the "kill zone," and that [Joel F.] was in the zone of harm or "kill zone" at the time of the shot.  [¶]  If you have a reasonable doubt whether the defendant intended to kill [Joel F.] or intended to kill another by harming everyone in the "kill zone," or whether [Joel F.] was in the "kill zone" then you must find the defendant not guilty of the attempted murder of [Joel F.].'"  (*Id.* at p. 138, 92 Cal.Rptr.3d 362, 205 P.3d 272.)

The high court concluded the trial court erred in giving the foregoing instruction under the circumstances presented.  According to the court:  "The kill zone theory simply does not fit the charge or facts of this case.  That theory addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons.  Here, defendant was charged with but a single count of attempted murder.  He was not charged with 10 attempted murders, one for each member of the group at which he shot.  As the Court of Appeal explained, 'There was no evidence here that [defendant] used a means to kill the named victim, Joel F., that inevitably would result in the death of other victims within a zone of danger.  [Defendant] was charged only with the attempted murder of Joel F. and not with the attempted murder of others in the group on which [defendant] fired his gun.'"  (*Stone, supra,* 46 Cal.4th at p. 138, 92 Cal. Rptr. 3d 362, 205 P.3d 272.)

However, the high court went on to explain that a person who intends to kill may be found guilty of attempted murder even if he does not have a particular victim in mind.  (*Stone, supra,* 46 Cal.4th at p. 140, 92 Cal. Rptr. 3d 362, 205 P.3d 272.)  But, in *Stone,* the defendant was charged with attempting to kill a specific victim.  According to the court:  "This allegation was problematic given that the prosecution ultimately could not prove that defendant targeted a specific person rather than simply someone within the group.  In hindsight, it would no doubt have been better had the case been charged differently.  In a case like this, the information does not necessarily have to name a specific victim."  (*Id.* at p. 141, 92 Cal. Rptr. 3d 362, 205 P.3d 272.)

The present matter is similar to *Stone.*  Here, [Bruno-Martinez] was charged with a single count of attempted murder of a specific victim based on shots fired at a group of four people.  However, unlike *Stone,* the present matter involved at least six shots fired at a group of four people in a car under circumstances whereby a reasonable jury could conclude [Bruno-Martinez] intended to kill all of them, including the named victim.  That makes all the difference.  The kill zone instruction does not eliminate the requirement of specific intent to kill the named victim, as [Bruno-Martinez] argues.  Rather, it gives the jury two options for finding intent to kill.  Either [Bruno-Martinez] intended to kill Roland R., or he intended to kill all four people in a group that included Roland R.  (See *People v. Anzalone* (2006) 141 Cal. App. 4th 380, 393, 45 Cal. Rptr. 3d 876.)

[Bruno-Martinez] suggests the instruction nevertheless permitted the jury to convict him of the attempted murder of Roland R. on a transferred intent theory.  He relies specifically on the repeated use of the word "anyone" in the instruction.  As

quoted above, the instruction given by the court read: "A person may intend to kill a specific victim or victims and at the same time intend to kill *anyone* in a particular zone of harm or 'kill zone.' In order to convict the [Bruno-Martinez] of the attempted murder of Roland [R.], the People must prove that [Bruno-Martinez] not only intended to kill *anyone* in Carmen [M.]'s car but also either intended to kill Roland [R.], or intended to kill *anyone* within the kill zone. If you have a reasonable doubt whether [Bruno-Martinez] intended to kill Roland [R.] by harming everyone in the kill zone, then you must find [Bruno-Martinez] not guilty of the attempted murder of Roland [R.]" (Italics added.)

In *Stone,* the high court indicated the word "anyone" in the standard jury instruction on the kill zone theory should be replaced with "everyone." (*Stone, supra,* 46 Cal.4th at p. 138, fn. 3, 92 Cal. Rptr. 3d 362, 205 P.3d 272.) However, the court also noted that, "[i]n context, a jury hearing about the intent to kill *anyone* within the kill zone would probably interpret it as meaning the intent to kill *any* person who happens to be in the kill zone, i.e., *everyone* in the kill zone." (*Ibid.*) The last sentence of the instruction refers to a reasonable doubt whether [Bruno-Martinez] intended to kill Roland R. by harming *everyone* in the kill zone.

In evaluating a claim the jury could have misconstrued an instruction, the test on review is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*People v. Raley* (1992) 2 Cal.4th 870, 901, 8 Cal. Rptr. 2d 678, 830 P.2d 712, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 [116 L.Ed.2d 385, 399].) In this instance, we find no reasonable likelihood the jury would have read the instruction as a whole to mean it could find [Bruno-Martinez] guilty of attempted murder of Roland R. if it concluded [Bruno-Martinez] intended to kill one of the others in the car rather than everyone in the car.

[Bruno-Martinez] also contends the last sentence of the instruction erroneously used the word "harm" rather than "kill." In *Stone,* the high court also noted that, "[b]ecause the intent required for attempted murder is the intent to kill rather than merely harm, it would be better for the instruction to use the word 'kill' consistently rather than the word 'harm.' (*Stone, supra,* 46 Cal. 4th at p. 138, fn. 3, 92 Cal. Rptr. 3d 362, 205 P.3d 272.) Here again, however, as we explained in *People v. Bragg, supra,* 161 Cal. App.4th at page 1396, 75 Cal. Rptr. 3d 200: "No reasonable juror could have failed to understand from the instructions as a whole that, to the extent the court occasionally used the word 'harm' or the phrase 'zone of harm,' the harm to which the court referred was the ultimate harm of death and that the law required that defendant had to have intended to kill the victims."[18]

A challenged instruction violates the Federal Constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the

---

[18] *Id.* at *3-5.

consideration of constitutionally relevant evidence."[19]  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.[20]  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.[21]  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."[22]

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[23]  California law provides the definition for what constitutes a "kill zone" and its effect insofar as establishing the requisite intent for a conviction of attempted murder.  In this case, Bruno-Martinez does nothing more than argue that the trial court in giving the "kill zone" instruction did so contrary to California law, a matter beyond the purview of this Court in a federal habeas proceeding.[24]  A petitioner may not transform a state-

---

[19] *Boyde v. California,* 494 U.S. 370, 380 (1990).

[20] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see Victor v. Nebraska*, 511 U.S.1, 6 (1994) (citing *McGuire*).

[21] *McGuire*, 502 U.S. at 72-73.

[22] *Id*.

[23] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[24] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied); *see Waddington v. Sarausad*, 555 U.S. 179, 189, n.5 (2009) ("The Washington Supreme Court expressly held that the jury instruction correctly set forth state law, . . . and we have repeatedly held that 'it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.'" (quoting *McGuire*, 502 U.S. at 67-68)).

law issue into a federal one by simply asserting a violation of due process.[25]   "[The Supreme

Court has] long recognized that a mere error of state law is not a denial of due process."[26]

"[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited

to whether the error 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'"[27]   "Federal courts hold no supervisory authority over state judicial

proceedings and may intervene only to correct wrongs of constitutional dimension."[28]   Having

failed to raise a question of constitutional dimension, Bruno-Martinez is not entitled to relief

under his first ground.

<u>Ground 2:  Jury Tampering</u>

A juror expressed concerns to the court bailiff about being photographed.  The trial court

conducted an interview with the juror out of the presence of the jury.  Bruno-Martinez contends

that the trial court erred in not interviewing the entire jury.  As recited by the California Court of

Appeal the facts underlying this claim were as follows:

---

[25] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[26] *Cooke*, 131 S. Ct. at 863 (internal quotation marks and citations omitted).

[27] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[28] *Smith v. Phillips*, 455 U.S. 209, 221 (1982) (citations omitted); *see Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) ("It is beyond dispute that we do not hold a supervisory power over the courts of the several States." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

*Jury Tampering*

On the evening of the shooting, Carmen M. told investigators that when the shots were fired, she looked up and saw the shooter.  She described him and said she was certain she could identify him.  Later, Carmen selected defendant's picture from a photographic lineup and identified defendant as the shooter from a photograph taken that evening.  Carmen indicated at the time that the argument began over Roland's tattoo, she tried to step between the two men, but defendant pushed her away.  She further indicated defendant started shooting at the car.

However, when called to testify at trial, Carmen claimed she could not remember who had shot at them.  She claimed to have memory problems.  In fact, she claimed not to be able to remember a discussion she had with a deputy district attorney and an investigator earlier that day.

An investigator for the district attorney's office later testified that, on the day of her testimony, Carmen told him she was sitting in the hallway outside the courtroom and defendant's mother was also present and may have taken her picture with a cell phone.  Carmen also indicated two women showed up at court that day and one of them knew her and would be able to identify her.  Carmen indicated she was frightened to testify and would therefore claim in court that she did not remember anything.  Carmen confirmed the foregoing in court.  Although she indicated she did not know if a photograph had been taken of her, she admitted telling the investigator she did not know why else the woman would walk past her with her cell phone open except to take her picture.  Carmen further acknowledged that, prior to this event, she had never expressed to the prosecutor or his investigator that she did not remember the events surrounding the shooting.

"JUROR NUMBER ONE:  My concern was general.  The individuals who I believe had been identified as having possibly taken a picture of the one witness were out in the hallway with their cameras.

"There's actually three individuals with cameras—not with cameras—with telephones which possibly could have cameras on them.  I have no personal knowledge.  However, they were holding them out and moving them around.

"The entire jury was right in the area where they were doing this.  I looked at it and I thought it was a little strange, and I thought I should bring it to the bailiff's attention. I have no specific knowledge of anything.

"THE COURT:  Do you have any concern yourself that might affect your ability to be a fair juror at this point as a result of making those observations in the hallway?

"JUROR NUMBER ONE:  No.  If I was majorly [*sic*] concerned and wanted to be excused, I would have told the bailiff.

"THE COURT: Okay.  I can tell you that the bailiff has spoken to the individuals in question.  At this point there is no concrete evidence that any photos were taken or tried to be taken, but we will monitor the situation.

"We just want to make sure that any concerns that might be raised apropos to the testimony we heard in this case are being addressed, and I wanted to find out specifically if your ability to be a fair juror has been affected in any way.

13

"As I understand it, you are saying no?

"JUROR NUMBER ONE:  No.

"THE COURT:  Okay. Thank you very much.

"JUROR NUMBER ONE:  Solely on the evidence.

"THE COURT:  See you on Monday.

"MR. HIGHTOWER [the prosecutor]:  If we can ask for follow-up about discussion with other jurors.

"THE COURT:  Let me ask you that, sir:  Have you discussed the same sort of concerns that you raised with the bailiff with other jurors?

"JUROR NUMBER ONE:  Have I discussed it?  No, I have not.

"THE COURT:  All right.  Thank you.

"MR. LIPPSMEYER [defense counsel]:  And—

"THE COURT:  I have to ask all the questions.  You are not allowed to ask direct questions.

"MR. LIPPSMEYER:  I want to know if there has been other discussions or-

"THE COURT:  "Has anyone else discussed the matter with you, or did you overhear any discussion from other jurors apropos of that subject?"

"JUROR NUMBER ONE:  No.  What made me notice it, I pulled my notes out of my book and looked up, was the fact that two of the young lady jurors—and I wouldn't even be sure of which two, possibly one, were standing close by and they were looking at these people.

"They showed a little concern on their faces, which is kind of what made me look up and then look at what was going on.  Then I thought, well, I will say something.

"THE COURT:  Okay. Thanks for the information.  Thank you.

"JUROR NUMBER ONE:  Sure. Have a good weekend.

"THE COURT:  All right."

After the juror departed, the court questioned the bailiff.  The bailiff indicated he spoke to [Bruno-Martinez's] mother, and she said "she was walking down the hall talking on one [cell phone] and texting with the other and that she didn't take any photos."  Defense counsel added that he examined the cell phones and found they were not camera phones.

[Bruno-Martinez] contends the trial court failed to make a sufficient inquiry about the incident.  He argues the court should have questioned all the jurors, not just Juror No. 1.  The People respond that [Bruno-Martinez's] argument is based on speculation that other jurors were impacted by the incident and, in any event, [Bruno-Martinez] forfeited the issue by failing to request that the other jurors be questioned.[29]

The California Court of Appeal held:

---

[29] *Bruno-Martinez*, 2010 WL 1217966 at *5-7.

We agree the issue is forfeited.  [Bruno-Martinez] never requested that the court question the other jurors after hearing from Juror No. 1.  After excusing Juror No. 1, the court asked both counsel if there was anything they wanted to state for the record.  Both counsel answered no.  Defense counsel then said: "I am terribly—for the record I don't know that I am terribly satisfied with that, but the purpose of the 136 questions and nobody has ever been killed in Sacramento County, if there was as much as anything to rest assurances, but I do think it can be a real problem.  [¶] He [Juror No. 1] didn't seem to show any fear but I am concerned that other people are concerned.  I don't know if it would do any good to call mom and bring her cell phone.  She had two.  She had her mother's and she was texting on one and whatever."  The court declined to bring in [Bruno-Martinez's] mother to question her about the cell phone incident.

Nowhere in the foregoing did defense counsel request any further inquiry of the jurors.  It is one thing to be concerned about the situation and another to propose that the court do something more about it.  In *People v. Holloway* (2004) 33 Cal.4th 96, at pages 126-127, 14 Cal. Rptr. 3d 212, 91 P.3d 164, the California Supreme Court concluded the defendant forfeited a claim that the trial court failed to make a more thorough inquiry of a particular juror regarding bias by failing to seek a broader inquiry of the juror at the time or otherwise object to the trial court's course of action.  [Bruno-Martinez] contends *Holloway* is distinguishable in that it involved one juror whom the court did question whereas here the argument is that the court failed to conduct any inquiry whatsoever as to the other 11 jurors.  However, this is a distinction without a difference.  The question is whether the court was required to do more than it did.  By failing to request that the court do more, the issue is forfeited.

At any rate, any presumption of prejudice from the conduct in question was clearly rebutted.  [Bruno-Martinez] argues the trial court made a factual finding that the incident in question created apprehension among the jurors, and we must defer to this factual finding.  However, the court made no such finding.  [Bruno-Martinez] is referring to a comment by the court after defense counsel offered to tell [Bruno-Martinez's] mother not to text while in court.  The court responded:  "If you have enough of a relationship with her to be able to say so, you might tell her that her activities with the phone are creating apprehension to some extent and she ought to just keep it in her purse and keep it off."  This is not a finding that the activities of [Bruno-Martinez's] mother were in fact causing apprehension.  The court merely suggested that defense counsel tell her so in order to get her to stop.

The Sixth Amendment gives a defendant the right to a trial by an impartial jury.  (U.S. Const., Amend. VI; see U.S. Const., Amend XIV & Cal. Const., art. I, § 16.)  "'In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . .' [Citation.]" (*Remmer v. United States* (1956) 350 U.S. 377, 379 [100 L.Ed. 435].)

"Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the

misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. [Citations.] [¶] The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection . . . . If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.'" (*In re Hamilton* (1999) 20 Cal.4th 273, 296, 84 Cal. Rptr. 2d 403, 975 P.2d 600.)

[Bruno-Martinez] appears to base his claim of prejudice on whether and to what extent any of the jurors may have been intimidated by the improper conduct of [Bruno-Martinez's] mother. However, this line of attack is misguided. To the extent the jurors were intimidated, this could only inure to [Bruno-Martinez's] benefit by coercing those jurors into deciding in his favor to avoid future threat. This matter must be distinguished from those cases where juror's may may have been intimidated by outbursts from relatives of the *victim.* (See, e.g., *People v. Chatman* (2006) 38 Cal.4th 344, 369, 42 Cal. Rptr. 3d 621, 133 P.3d 534; *People v. Lucero* (1988) 44 Cal.3d 1006, 1022, 245 Cal. Rptr. 185, 750 P.2d 1342.) In the latter cases, the jurors might have been intimidated to decide against the defendant to appease the victim's relatives.

[Bruno-Martinez's] real concern here is not that certain jurors were intimidated but that certain jurors were *not* intimidated but were instead angered by the conduct and took that anger out on [Bruno-Martinez]. But here, there is nothing in the information provided to the court by Juror No. 1 to suggest he or the other jurors might have been angered by the incident or might hold what had occurred against [Bruno-Martinez]. A juror's concern for safety from a defendant's relatives or supporters does not necessarily translate into bias against the defendant. (See *People v. Panah* (2005) 35 Cal.4th 395, 480, 25 Cal. Rptr. 3d 672, 107 P.3d 790.) Here, the trial court satisfied itself that [Bruno-Martinez] would not be prejudiced by the alleged conduct. Nothing more was required.

[Bruno-Martinez] contends the court was required to question the other jurors under section 1120. It reads: "If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial. If, during the retirement of the jury, a juror declare [*sic*] a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror."

It is readily clear section 1120 has no application to the present matter.  There is no suggestion any of the jurors had knowledge of any facts at issue in this prosecution.  Their knowledge, if any, related to a peripheral matter concerning alleged jury tampering unrelated to the facts of the case.  [Bruno-Martinez] was not charged with jury tampering.[30]

Respondent contends that, because the California Court of Appeal held that Bruno-Martinez's had forfeited his claim by not requesting that the trial court make any further inquiry into the concern raised by the juror, he is procedurally barred from asserting it before this Court. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[31]  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims . . . ."[32]  "The state-law claim may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."[33]  "[I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default."[34]

Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case clearly and expressly states that its judgment rests on a state-

---

[30] *Bruno-Martinez*, 2010 WL 1217966 at *5-9.

[31] *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

[32] *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992).

[33] *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).

[34] *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

17

procedural bar.[35]  The fact that the state court also ruled on the merits in the alternative does not

vitiate a procedural-bar defense.[36]  Although the ultimate burden of proving adequacy of a state-

procedural bar is on the Respondent, once Respondent has "adequately pled the existence of an

independent and adequate state procedural ground as an affirmative defense, the burden to place

that defense in issue shifts to the petitioner."[37]  The petitioner may satisfy his burden "by

asserting specific factual allegations that demonstrate the inadequacy of the state procedure,

including citation to authority demonstrating inconsistent application of the rule."[38]  In his reply

Bruno-Martinez simply argues that Court of Appeal did not state the ground upon which the

forfeiture rested.  To the contrary, the California Court of Appeal clearly and unequivocally

stated that the ground was a failure to request that the other jurors be questioned on the subject.

Bruno-Martinez advances no argument that the state-procedural bar was inadequate or

inconsistently applied.  Respondent has asserted the state procedural bar as an affirmative

defense.  On the other hand, Bruno-Martinez has failed to shoulder his burden of placing it in

issue.  Bruno-Martinez's reliance on *United States v. Brande*[39] is misplaced.  Not only is *Brande*,

a Ninth Circuit Court of Appeals decision not binding in this case,[40] but it is also factualy

--------

[35] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[36] *Comer v. Schriro*, 480 F.3d 960, 964 n. 6 (9th Cir. 2007) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

[37] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[38] *Id.*

[39] 329 F.3d 1173 (9th Cir. 2003).

[40] *Musladin,* 549 U.S. at 76-77; *Holley v. Yarborough*, 568 F.3d 1091, 1097 (9th Cir. 2009).

distinguishable.  Unlike Brande, who was not granted a hearing, Bruno-Martinez was not only

granted a hearing, he was granted exactly the hearing he requested.  Reduced to its essence, the

argument advanced by Bruno-Martinez is that the trial court should have made further inquiry of

the remaining jurors *sua sponte*.  Not only has Bruno-Martinez cited no controlling authority to

support that argument, but independent research by this Court has not uncovered any such

authority.  The facts as presented to the trial court do not compel a finding that the California

Court of Appeal erred in its assessment that the trail court was satisfied that no prejudice

occurred.[41]  Not only is Bruno-Martinez procedurally barred from asserting his second ground in

this Court, he is not entitled to relief on this claim in any event.

Ground 3:  Sufficiency of the Evidence – Gang Enhancement

Bruno-Martinez submits a laundry-list of gang "primary activities" he contends were

insufficiently supported by the evidence.  The California Court of Appeal rejected Bruno-

Martinez's arguments as presented to it, holding:

> *Sufficiency of the Evidence-Gang Enhancement*
> [Bruno-Martinez] contends the evidence is insufficient to support the gang
> enhancements.  In particular, he argues that, while there was evidence regarding a
> variety of gangs, the People presented no evidence of collaborative activities among
> them, which would be necessary to aggregate their activities for purposes of
> satisfying the gang enhancement requirement. [Bruno-Martinez] further argues that,
> even considering the activities of the individual gangs combined, there was
> insufficient evidence of the various elements necessary for a gang enhancement.

---

[41] Bruno-Martinez attempts to bootstrap his claim of prejudice using Carmen's testimony
concerning her fear of testifying.  While the witness may have feared testifying as a result of the
possibility that Bruno-Martinez's mother may have photographed her (as well as the fact that one
of the spectators might also have been able to identify her), there is nothing whatsoever in the
record to indicate that any member of the jury, other than Juror Number One, expressed any
concern about being photographed.  More importantly, as the Court of Appeal noted, there is no
evidence that any juror was angered.  Habeas relief cannot be based upon conjecture or
speculation.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam).

In reviewing the sufficiency of the evidence supporting a conviction, we view the evidence in the light most favorable to the prosecution and determine if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (*People v. Davis* (1995) 10 Cal.4th 463, 509, 41 Cal. Rptr. 2d 826, 896 P.2d 119.) We review the whole record, not isolated bits of evidence, to determine if it supports the judgment below. (*People v. Johnson* (1980) 26 Cal.3d 557, 578, 162 Cal. Rptr. 431, 606 P.2d 738.) "'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.'" (*Id.* at p. 576, 162 Cal. Rptr. 431, 606 P.2d 738, quoting from *People v. Reilly* (1970) 3 Cal.3d 421, 425, 90 Cal. Rptr. 417, 475 P.2d 649.)

Substantial evidence is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. (*Roddenberry v. Roddenberry* (1996) 44 Cal. App. 4th 634, 651-652, 51 Cal. Rptr. 2d 907.) Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. (*Id.* at p. 651, 51 Cal. Rptr. 2d 907.) "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.]" (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal. App.3d 1113, 1135, 234 Cal. Rptr. 630.)

Section 186.22 provides for enhanced punishment in the event a felony is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), [of section 186.22,] having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal activity." (§ 186.22, subd. (f).) The enumerated offenses include robbery (186.22, subd. (e)(2)), unlawful homicide or manslaughter (§ 186.22, subd. (e)(3)), "sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances" (§ 186.22, subd. (e)(4)), shooting at an occupied vehicle (§ 186.22, subd. (e)(5)), burglary (§ 186.22, subd. (e)(11)), carjacking (§ 186.22, subd. (e)(21)), and "[p]ossession of a pistol, revolver, or other firearm capable of being concealed upon the person" (§ 186.22, subd. (e)(23)). Within the meaning of section 186.22, "'pattern of criminal activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of" the enumerated offenses, provided "the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

In order to impose an enhancement under section 186.22, it is first necessary to identify the gang for whom the offense was committed.  In *People v. Williams* (2008) 167 Cal. App. 4th 983, 86 Cal. Rptr. 3d 130, the defendant was convicted of murder and active participation in a criminal street gang named the "Small Town Peckerwoods," which was alleged to be part of a larger "Peckerwoods" gang.  On appeal, the defendant argued, among other things, there was insufficient evidence to support the gang charge.  In particular, the defendant argued the relevant group to consider was the local gang, the Small Town Peckerwoods, not the larger group, and there was insufficient evidence regarding the activities of the smaller group to support the conviction.  (*Id.* at pp. 985, 987, 86 Cal. Rptr. 3d 130.)

The Court of Appeal agreed and reversed the gang conviction.  In the context of "the relationship that must exist before a smaller group can be considered part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang" (*People v. Williams, supra,* 167 Cal. App. 4th at p. 985, 86 Cal. Rptr. 3d 130), the court said: "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang.  Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id.* at p. 988, 86 Cal. Rptr. 3d 130.)  The court concluded no such showing had been made in that case.  (*Ibid.*)

[Bruno-Martinez] suggests there was no evidence presented here of collaborative activities or a collective organizational structure among the various subsets of the Nortenos criminal street gang, including the Fruitridge Vista Nortenos.  Hence, he argues, activities by one subset could not be used to prove the elements required for a gang enhancement involving another subset.  This is a red herring.  The People did not attempt to prove [Bruno-Martinez] committed the offenses for the benefit of the Fruitridge Vista Nortenos by presenting evidence of the activities of other Nortenos subsets.  Detective Ramos, the prosecution's gang expert, testified that the Nortenos are a criminal street gang with approximately 3,000 members in Sacramento County.  He also identified the Fruitridge Vista Nortenos as a subset of the larger group with two to three dozen members in a particular geographic location.  Detective Ramos testified [Bruno-Martinez] has been a validated member of the Nortenos since 2001 and continues to be a member.  He did not indicate whether [Bruno-Martinez] was a member of the Fruitridge subset and did not know whether the Fruitridge subset had its own constitution or bylaws or used its own gang signs.

In *People v. Ortega* (2006) 145 Cal. App. 4th 1344, 52 Cal. Rptr. 3d 535, we rejected the defendant's argument that the prosecution was required to prove which subset of the Nortenos was involved in the case.  We explained that evidence had been presented through the prosecution's gang expert "to establish every element of the existence of the Nortenos as a criminal street gang" (*id.* at p. 1356, 52 Cal. Rptr. 3d 535) and "[n]o evidence indicated the goals and activities of a particular subset were not shared by the others" (*id.* at p. 1357, 52 Cal. Rptr. 3d 535).  Although

[Bruno-Martinez's] gang expert, Mark Harrison, testified the Nortenos is not necessarily a gang itself but is a "movement in which individuals click up and have their unique gang identity based on that," he later acknowledged the Nortenos is a criminal street gang with three or more members, having common signs or symbols, who have primary activities that are criminal in nature, although different subsets may have different primary activities.

[Bruno-Martinez] next argues that even if it is proper to consider the Nortenos as a whole, some of the offenses used by the prosecution to establish the elements of the gang enhancement are not qualifying offenses under section 186.22 and the expert opinion that other offenses are primary activities of the gang "was not supported by proper *facts and reasons.*" [Bruno-Martinez] points to Detective Ramos's opinion that possession of controlled substances for sale is a primary Norteno activity is not supported by the facts, in that Detective Ramos described an arrest for simple possession rather than possession for sale. Simple possession of a controlled substance is not a listed offense under the gang statute. [Bruno-Martinez] further asserts Detective Ramos cited homicides as a primary activity but then referred only to one such homicide. To be a primary activity, something more than the occasional commission of the offense is required. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323, 109 Cal. Rptr. 2d 851, 27 P.3d 739.)

[Bruno-Martinez] further argues Detective Ramos's opinion that "shootings" and "possession of weapons" are primary activities cannot support his opinion that this was a gang-related shooting, because "shooting" and "possession of weapons" are not listed crimes. He further argues Detective Ramos's opinion that "stolen vehicles," "robbery," and "burglary" are primary activities is not supported by any facts or reasons.

Finally, [Bruno-Martinez] argues the particular offenses relied upon by Detective Ramos as the predicate crimes, i.e., carrying a concealed weapon, attempted murder, and shooting at an occupied vehicle, will not suffice because Ramos did not identify those offenses as primary activities of the Nortenos.

We are not persuaded. There is no requirement that all the primary activities identified by the gang expert be listed offenses under section 186.22, as long as at least one of them is. The statute defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as *one* of its primary activities the commission of *one or more* of the criminal acts enumerated" in the statute. (§ 186.22, subd. (f), italics added.) Here, Detective Ramos identified the primary activities of the Nortenos gang as including homicides, robberies and burglaries. All three of these are enumerated crimes. He indicated his opinion regarding the primary activities of the Nortenos came from personal contacts with gang members who have been arrested and in some cases convicted of those crimes. He also indicated he has reviewed cases where gang members have been arrested for those offenses, even though he had no personal involvement in those cases. He was then asked to provide some examples. He mentioned a homicide in 2004 and a current homicide prosecution. However, there was no indication these were the only cases of which he was familiar.

[Bruno-Martinez's] argument assumes that in order to consider a particular crime as a primary activity of a gang, the prosecution must present specific evidence of numerous such crimes committed by gang members.  However, that is not the law.  This evidence may be presented in summary fashion, as Detective Ramos did here.  If [Bruno-Martinez] did not believe Detective Ramos had information about a sufficient number of enumerated offenses to back up his conclusion, it was [Bruno-Martinez's] burden to explore the issue.

Finally, as to [Bruno-Martinez's] argument that the particular predicate offenses relied upon by Detective Ramos will not suffice because Ramos failed to identify those offenses as primary activities of the Nortenos, this is a nonstarter.  There is no requirement that the gang expert rely on predicate offenses that are also primary activities of the gang.[42]

Respondent contends that Bruno-Martinez did not identify in his petition for review in the California Supreme Court the offenses that he specifically identifies in his Petition to this Court and identified on his appeal before the California Court of Appeal.  Consequently, Respondent argues that Bruno-Martinez has not properly exhausted his third ground by failing to present both the legal and factual bases for his claims to the state's highest court.[43]  This Court disagrees.  This Court's reading of Bruno-Martinez's petition to the California Supreme Court does not support Respondent's underlying contention.  Bruno-Martinez not only identified the offenses or factors, but also argued why the evidence did not support any of those offenses or factors that made up the gang-related activity enhancement.  Accordingly, this Court rejects Respondent's failure to exhaust defense.

In deciding the merits, initially this Court notes that to the extent that Bruno-Martinez argues that certain evidence is a pre-requisite to establishing the gang-related enhancement under California law, that argument fails.  The requirements for a gang-related enhancement under state

---

[42] *Bruno-Martinez*, 2010 WL 1217966 at *9-13.

[43] *See Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir.2003) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

law are not within the purview of this Court in a federal habeas proceeding.[44]  As articulated by

the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is

whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[45]

In so doing, however, this Court is guided by the fundamental precept of dual federalism that the

States possess primary authority for defining and enforcing the criminal law.[46]  Consequently,

although the sufficiency of the evidence review by this Court is grounded in the Fourteenth

Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in

state law.[47]

Under *Jackson*, the role of this Court is to simply determine whether there is any

evidence, if accepted as credible by the jury, sufficient to sustain the conviction.[48]  In this case,

the California Court of Appeal determined that there was sufficient evidence of the elements of

the gang-related enhancement as defined in California law to support Bruno-Martinez's

conviction.  Although it might have been possible to draw a different inference from the

evidence, this Court is required to resolve that conflict in favor of the prosecution.[49]  Bruno-

Martinez bears the burden of establishing by clear and convincing evidence that these factual

_____

[44] *Cooke*, 131 S. Ct. at 863.

[45] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[46] *See Isaac*, 456 U.S. at 128.

[47] *Jackson*, 443 U.S. at 324 n.16.

[48] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[49] *See Jackson*, 443 U.S. at 326.

findings were erroneous;[50] a burden he has failed to carry.  The record does not compel the conclusion that no rational trier of fact could have found sufficient proof to satisfy the requirements of the gang-related enhancement as defined by California law, especially considering the double deference owed under *Jackson* and AEDPA.  Bruno-Martinez is not entitled to relief under his third ground.

## V.  CONCLUSION AND ORDER

Bruno-Martinez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[51]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[52]

The Clerk of the Court is to enter judgment accordingly.

Dated: October 11, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[50] 28 U.S.C. § 2254(e)(1).

[51] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[52] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.